## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN E.,

                  Claimant,

       v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

              Respondent.

No. 19 CV 1883

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Claimant John E.[1] ("Claimant") seeks review of the final decision of Respondent Kilolo Kijakazi,[2] Acting Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 6]. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c), and the parties have filed cross-motions for relief [ECF Nos. 13, 19] pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, Claimant's Motion to Reverse

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Acting Commissioner Kijakazi as the named defendant.

the Decision of the Commissioner of Social Security [ECF No. 13] is denied and the Commissioner's Motion for Summary Judgement [ECF No. 19] is granted.

## PROCEDURAL HISTORY

On August 28, 2014, Claimant filed a Title II application for DIB alleging disability beginning on January 18, 2013. (R. 107-109, 236-37). His claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 85-106, 120-21). On November 2, 2016, Claimant appeared at a hearing before ALJ Diane S. Davis. (R. 76-84). The hearing was continued so that Claimant could obtain representation and a second hearing, at which Claimant testified, was held on March 7, 2017. (R. 40-75). ALJ Davis also heard testimony on that date from impartial vocational expert ("VE") Edward P. Steffan. (R. 68-74). On May 18, 2017, ALJ Davis denied Claimant's claim for DIB. (R. 24-34).

In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. §§ 404.1520(a), 416.920(a). At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the relevant period from January 18, 2013, his alleged onset date, through March 31, 2017, his date of last insured. (R. 26). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c). (R. 26). Specifically, Claimant suffered from cardiomyopathy; atrial fibrillation; hypertension; sleep apnea; chronic obstructive pulmonary disease (COPD); and obesity. (R. 26-27). The

ALJ also acknowledged a non-severe complaint, diabetes mellitus, but concluded that it did not cause work-related limitations. (R. 26-27).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 27). In particular, the ALJ considered listings 3.02, 4.02, and 4.05, but concluded that Claimant did not meet or medically equal the severity of those listings, nor did any "acceptable medical source [mention] findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (R. 27). Regarding listing 3.02A, the ALJ noted that Claimant's single pulmonary function study in 2014 did not constitute proof of listing level severity, in that the record did not provide evidence of at least three forced expiratory maneuvers performed during the same test session, which the regulations require. (R. 27). Nor did the ALJ see any pulmonary function tests in the medical record beyond the single study in 2014, meaning that even if Claimant had demonstrated listing level scores on that one occasion, there was no evidence of ongoing significant severity. (R. 27). With respect to listing 4.02, the ALJ concluded that Claimant did not meet numerous listing requirements, (R. 27-28), and in particular, had a recent echocardiogram that showed left ventricular ejection fraction of 60%, which is in a normal range, as was Claimant's earlier testing that showed 55%-60%. (R. 28). Finally, the ALJ substantively discussed listing 4.05 but noted that Claimant's arrhythmia did not meet the listing requirements for a number of reasons, including that Claimant had not presented adequate documentary

3

evidence to substantiate those listing requirements. (R. 28). The ALJ also touched on Claimant's obesity but noted that there was no evidence of record that Claimant's obesity contributed to any other severe impairment such that, in combination, those impairments would meet listing level severity. (R. 28).

The ALJ then found Claimant had the RFC,[3] through his date last insured, to:

> "perform light work, as defined in 20 CFR 404.1567(b). The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for about six hours total in an 8-hour workday, and sit for about six hours total. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but cannot climb ladders, ropes, and scaffolds. He should avoid concentrated exposure to temperature extremes, pulmonary irritants, and hazards, such as unprotected heights."

(R. 28).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a construction worker but that work, which was very heavy, exceeded Claimant's residual functional capacity and could no longer be performed. (R. 32). At step five, the ALJ concluded that, considering Claimant's age, education, past work experience, and residual functional capacity, he is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 32-33). Specifically, the VE's testimony, on which the ALJ relied, identified jobs including unskilled light occupations such as office helper, cashier, and cleaner housekeeper that Claimant could perform and that are available in significant numbers in the national economy. (R. 33). The ALJ then found Claimant was not

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

under a disability from January 18, 2013, the alleged onset date, through March 31, 2017, the date last insured. (R. 33).

The Appeals Council granted Claimant's request for review on April 23, 2018 and issued a written decision on June 27, 2018 explaining that Claimant was not entitled to benefits but that Claimant last met the insured requirements of the Social Security Act on June 30, 2017, meaning the hearing decision left an unadjudicated period from April 1, 2017 through May 18, 2017. (R. 9-11). Substantively, however, the Appeals Council adopted the ALJ's "statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable." (R. 9). Because there were no changes and no new evidence submitted,[4] the Appeals Council also adopted the ALJ's findings or conclusions from January 18, 2013 through March 31, 2017 and the previously unadjudicated period from April 1, 2017 and May 18, 2017. (R. 9-10). The Appeals Council adopted all of the ALJ's findings from Steps 1 through 5 of the sequential evaluation and agreed that Claimant had the RFC "perform a reduced range of light work with occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps or stairs, but can never climb ladders, ropes, or scaffolds. The claimant should avoid concentrated exposures to temperature extremes, pulmonary irritants and hazards such as unprotected heights." (R. 10). Ultimately, the Appeals Council agreed

---

[4] Although Claimant's attorney did request, and was granted, more time to submit additional information to the Appeals Council, it appears that Claimant ultimately did not submit a statement or any additional evidence for the Appeals Council to review. (R. 9, 14-19).

with the ALJ that Claimant's "limitations do not significantly erode the light, unskilled, occupational base" and that there were a significant number of jobs Claimant is capable of performing despite his limitations. (R. 11). A finding of "not disabled," the Appeals Council reasoned, was thus appropriate under the Act. (R. 11).

"[B]ecause the Secretary has delegated its authority to make final decisions to the Appeals Council," it is the Appeals Council's decision that constitutes the Secretary's final decision for purposes of judicial review under 42 U.S.C. § 405(g). *Bauzo v. Bowen*, 803 F.2d 917, 921 (7th Cir. 1986) (citations omitted). The decision of the Appeals Council is therefore final and reviewable by this Court. *Id.*

## STANDARD OF REVIEW

The Court's analysis begins with the well-established principle that federal courts may review only the Secretary's final decisions. *White v. Sullivan*, 965 F.2d 133, 136 (7th Cir. 1992) (citing *Califano v. Sanders*, 430 U.S. 99, 108 (1977)). The Appeals Council granted review in this case and, with a few modifications, adopted the ALJ's factual and legal conclusions in their entirety. Therefore, the Court must review both the Council's decision and the ALJ's underlying opinion as modified in timeframe only. 20 C.F.R. § 404.981; *see, e.g., Arbogast v. Bowen,* 860 F.2d 1400, 1420-03 (7th Cir. 1988) ("We therefore review the decision of the Appeals Council rather than the decision of the ALJ. However, in this case, the Appeals Council explicitly adopted, as modified, the opinion of the ALJ. Accordingly, we must review the decision of the ALJ as modified by the Appeals Council.").

6

The Appeals Council is held to the same standard as the ALJ. *Sanford v. Berryhill*, 2018 WL 539804, at *3 (N.D. Ill. 2018) (citing *Bauzo*, 803 F.2d at 923). Judicial review is limited to determining whether the ALJ's decision – adopted by the Appeals Council here – is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). This Court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. But even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations

omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "[O]nly if the record compels a contrary result" will the court reverse the ALJ's decision. *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010) (internal quotation marks and citation omitted).

## ANALYSIS

### I. The ALJ's Assessment of Claimant's Subjective Symptom Statements

The Court first turns to the ALJ's[5] evaluation of Claimant's subjective symptom statements, which will be upheld unless it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). In this case, the ALJ discounted Claimant's testimony regarding the intensity, persistence, and limiting effects of his symptoms because this testimony was, in the ALJ's view, inconsistent with the objective medical evidence and Claimant's activities of daily living, course of treatment, and functional limitations. Still, Claimant argues that the ALJ's credibility determination was patently wrong for two reasons. First, he argues that the ALJ erred by finding that some of his daily activities, including painting and riding a bicycle, contradicted the alleged intensity of his symptoms. Second, he charges that the ALJ improperly played doctor when she

---

[5] Because the Appeals Council adopted the substance of ALJ's opinion in its entirety, the Court will predominantly refer and cite to the ALJ's reasoning.

focused on his "normal" examination findings in his medical records to the exclusion of other evidence – in particular, the records of his treating cardiologist Dr. Parag Jain. Neither argument is availing.

The regulations[6] provide a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain. *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); see also 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities [...]." *Id.* The ALJ must justify her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL

---

[6] SSR 16-3p supersedes SSR 96-7p for disability determinations issued on or after March 28, 2016 and eliminates the use of the term "credibility" to "clarify that subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, at *1. However, the factors to be considered in evaluating symptoms under either SSR 96-7p and SSR 16-3p are the same, and so the Court also is bound by case law concerning former SSR 96-7p. Compare SSR 96-7p, 1996 WL 374186 (July 2, 1996), with SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017).

5180304, at *5, *7-8. A claimant's assertions of pain, taken alone, are not conclusive of disability. See 42 U.S.C. § 423(d)(5)(A).

The ALJ summarized Claimant's subjective symptom testimony as follows:

"The claimant testified that he could not sit for four hours because his legs will swell, so he has to get up and move around. He can sit for two hours before elevating his legs, and then he has swelling in his legs and feet and his legs hurt. He elevates his legs a couple of times during the day and at night to avoid swelling. His energy levels are not good, and he starts falling asleep sitting upright. He has shortness of breath throughout the day, and uses Advair when needed. He has difficulty with temperature extremes. When it is very cold, he cannot feel his feet because of circulation, and he cannot breathe in cold or hot temperatures. With regard to breathing, he testified that he uses a BiPap machine with oxygen during the day, otherwise his hands and ankles will swell."

(R. 29); *see also* (R. 42-68).

In order to cohesively assess Claimant's subjective complaints, the ALJ separated those complaints into three general categories: Claimant's cardiac symptoms, his need to elevate his feet, and his respiratory issues. (R. 28-31). She then tackled whether each category was consistent with the objective medical evidence, activities of daily living, course of treatment, and functional limitations. In so doing, the ALJ considered the necessary factors under 20 C.F.R. § 404.1529(c) and adequately justified her subjective symptom evaluation with "specific reasons supported by the record," *Pepper,* 712 F.3d at 367, as discussed below.

### a. Cardiovascular Symptoms

First, regarding Claimant's cardiac symptoms, the ALJ cited specific pieces of medical evidence that, in her opinion, did not support the degree of limitation Claimant described. "[D]iscrepancies between the objective evidence and self-reports

may suggest symptom exaggeration." *Jones*, 623 F.3d at 1161; *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). And here, the records provided by Claimant's cardiologist, Dr. Jain, revealed that in the four visits Claimant had between 2015 and 2017, Claimant presented with normal cardiovascular findings that stood in stark contrast to the subjective complaints Claimant sometimes reported to Dr. Jain during those visits and reiterated during his testimony. (R. 680-81) (3/24/15) ("CV: no chest pain, palpitations, fatigue, or syncope…CV: AUSC: regular rhythm, normal S1, S2; no pathological murmurs, CAROTIDS: no carotid bruit, EXT: no edema."); (R. 682-83) (9/29/15) (same); (R. 684-85) (7/22/16) (same); (R. 686-87) (2/2/17) ("CV: no chest pains and palpitations...CV: AUSC: regular rhythm, normal S1, S2; no pathological murmurs, CAROTIDS: no carotid bruit, EXT: no edema."). Examinations performed by Claimant's pulmonologist Dr. Alexander Sosenko were similarly uneventful. (R. 701) (7/7/14) ("HEART: Regular rhythm. No obvious ectopy. No JVD (jugular venous distension)."); (R. 692-93) (8/18/14) ("Cardiac: Good heart tones with no murmurs with occasional ectopic beats."); (R. 695) (2/19/15) ("Cardiac: Irregular rhythm. No obvious JVD."). And Claimant's primary care physician, Dr. Rick Singh,[7] regularly credited and monitored Claimant's multiple diagnoses but, as relevant here, documented cardiac symptoms that were at odds with Claimant's testimony. (R. 705-06) (4/19/13) ("Patient denies any cardiovascular, respiratory, or genitourinary complaints today…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs.");

---

[7] Dr. Singh's records are sometimes signed "Dr. Jitinder Singh," and on other occasions, "Dr. Rick Singh." The Court assumes based on context that these are the same person.

(R. 708) (7/17/13) ("[Patient] denies any chest pain, pressure, no shortness of breath…HEART: regular rate and rhythm, normal S1S2, no murmurs, click, or rubs."); (R. 711-713) (11/6/13) ("Patient denies any cardiovascular, respiratory, genitourinary complaints today…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs."); (R. 715) (12/24/13) ("HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs."); (R. 716-17) (1/10/14) ("[Patient] denies any chest pain, pressure, no heart palpitations…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs,"); (R. 408-410); (R. 719-21) (10/8/15) ("Patient denies any cardiovascular, respiratory, genitourinary complaints today…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs."); (R. 649-51) (4/10/15) ("Patient denies any cardiovascular, respiratory, genitourinary complaints today…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs."); (R. 725) (6/16/16) ("Patient is a very nice 49-year-old gentleman who presents today for general annual checkup he denies any complaints he does have a past medical history is difficult for atrial fibrillation, hypertension, hyperlipidemia, diabetes mellitus he continues to follow up with his cardiologist on a regular basis. Patient denies any cardiovascular, respiratory, genitourinary complaints today…HEART: regular rate and rhythm, normal S1S2, no murmurs, click or rubs."). These consistently normal examination findings belied Claimant's testimony that his cardiovascular symptoms were entirely disabling.

Claimant correctly argues that an ALJ cannot ignore evidence that conflicts with her conclusion, *Briscoe*, 425 F.3d at 354, but the ALJ did not do so here. The ALJ

specifically took note of many of the facts that Claimant now argues on appeal should have been dispositive; for example, that there was a single sentence in Dr. Jain's medical notes in February of 2017 that because Claimant was likely in "severe diastolic heart failure," Dr. Jain would be "placing him at New York Heart Association [C]lass IV" and "will even consider cardiac transplant in this individual." (R. 687). [ECF No. 13] at 11-12. The ALJ went to great lengths to articulate why she was not swayed in her credibility assessment by the aforementioned isolated medical findings, particular given the longitudinal evidence of record. (R. 30) ("Dr. Jain suggested Claimant may require a transplant, but again ordered no additional testing to support this extreme statement. Instead of ordering further tests or recommending changes in cardiac treatment, Dr. Jain referred the claimant to a new primary care physician so that the claimant could continue to see Dr. Jain in network."). At the end of the day, the ALJ specifically considered the facts upon which Claimant now asks this Court to base its remand. (R. 30). She simply did not afford them the significance Claimant prefers. And if the ALJ's credibility assessment finds "some support" in the record, *Berger*, 516 F.3d at 546, it will not be disturbed – regardless of how this Court of review might have looked at the matter or weighed the evidence itself in the first instance. The ALJ was not simply required to accept Claimant's subjective complaints to the extent they clashed with other, objective medical evidence in the record. *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007). And as the ALJ explained, isolated references in the medical record to the "possibility" of a heart transplant and a Class IV NYHA Classification with nothing

13

else to support those statements and no follow-up did not, in her view, overcome a medical record replete with normal examination findings and relatively conservative courses of treatment for Claimant's cardiovascular issues.

So too did the ALJ find that Claimant's activities of daily living were largely incompatible with Claimant's testimony that his cardiovascular limitations were entirely work preclusive. And the ALJ was correct to consider these activities as one factor in her subjective symptom assessment. SSR 96–7p recognizes "the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," which is why the ALJ should also consider other evidence "when assessing the credibility of an individual's statements." 20 C.F.R. §§ 404.1529(c), 416.929(c). In that vein, the ALJ identified activities of daily living that she believed were inconsistent with the degree of disability Claimant alleged. *See. e.g, Adams v. Astrue,* 880 F. Supp. 2d 895, 907 (N.D. Ill. 2012) (the ALJ properly considered the claimant's daily activities, which included performing household chores and using public transportation, in determining the extent of Claimant's alleged symptoms); see also, 20 C.F.R. § 404.1529(c)(3)(i) (explaining that other evidence, including daily activities, is an "important indicator of the intensity and persistence of [claimants] symptoms."). In 2013, Claimant told Dr. Jain, his cardiologist, that he tries to stay active and Dr. Jain recommended that he continue to exercise at that time, without apparent limitation. (R. 423). In 2014, Dr. Jain documented – and the ALJ cited – the fact that Claimant "does not get any chest pain with exertion and he stays very active. He likes to go

biking but he cannot do any manual heavy labor." (R. 421). Dr. Jain similarly noted in 2014 that Claimant was going out to eat a lot, "he says with the Bears games." (R. 419). In 2015, Dr. Jain noted that Claimant was moving boxes and drywall, which the ALJ characterized as significant activity far beyond the limitations contained in the RFC in this case and acknowledged that the medical records noted caused Claimant "a little bit [of] shortness of breath." (R. 682). Claimant also testified that, throughout the relevant period, he cared for his children, drove them to and from school as necessary, and occasionally went shopping. (R. 30).

The ALJ weighed the above-described activities of daily living and reasonably concluded that, on balance, they undercut Plaintiff's own subjective testimony about his symptoms and impairments. *Burmester*, 920 F.3d at 510 ("The ALJ did not equate [the claimant's] ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules."). It was permissible, and even encouraged by the regulations, for the ALJ to do so. *Hostetter v. Saul*, 841 F. App'x 983, 987 (7th Cir. 2021) ("Based on records reflecting that, between 2015 and 2017, Hostetter worked as a carpenter, and testimony that he did housework, shopped, and cared for a young child, the ALJ could reasonably infer that his daily activities were "'somewhat greater than he has generally reported."'). That the ALJ did not fully accept Claimant's proffered explanations for the apparent contrast between the activities of daily living documented in the medical records and those Claimant described in his testimony –

15

for example, Claimant's response that he would not say he enjoyed the bicycle and only did it briefly, as a form of rehabilitation – is not indicative of error. The ALJ was in the best position to make credibility determinations about the explanations Claimant offered for the statements contained in the medical records, particularly where, unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation…in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul*, 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)).

Claimant may have preferred the ALJ assign different weight to pieces of evidence in the record to support his subjective symptom testimony that he had entirely work preclusive limitations. But the ALJ saw the longitudinal record differently and explained as much in her opinion, which is enough to satisfy this Court under the deferential standard of review afforded to credibility decisions made by administrative law judges.

### b. Elevated Legs

The ALJ next tackled Claimant's testimony that he must elevate his feet for an hour at least two or three times a day. (R. 30, 59-60). As required by the 20 C.F.R. § 404.1529(c) factors, the ALJ first evaluated Claimant's subjective testimony in light of the objective medical evidence and concluded that the two were incongruous. The ALJ credited the truth of Claimant's statements about elevating his legs but explained that such a severe limitation was not borne out by the medical evidence.

16

(R. 30). As the ALJ emphasized, Claimant's treatment providers never recommended that he elevate his legs at all, let alone for the frequency and duration that Claimant reported. *See, e.g., Anders v. Saul,* 2021 WL 2396236, at \*4 (7th Cir. 2021). Although Claimant makes a valiant effort to characterize the record in his favor and suggest that Claimant's treatment providers did in fact recommend Claimant elevate his legs, this argument is unsupportable. [ECF No. 13] at 9 (arguing that Claimant "was following his doctors' instructions regarding elevating his legs" because "Dr. Singh "instructed [Claimant] to elevate his legs 45 degrees for 20 minutes once or twice during the day" and Dr. Jain "wrote in his notes…that he needed to elevate his legs 70% of the time during an 8 hour work day"). Neither Dr. Singh nor Dr. Jain ever "recommended" to Claimant that he elevate his legs during the course of their treatment or wrote about the need for such treatment in their "notes." Instead, those doctors mentioned for the first time in the medical opinions they generated for the Social Security Administration that Claimant's work limitations may include the need to elevate his legs to reduce swelling during the workday. (R. 655) ("Based on your medical expertise, medical findings and treatment history please state the patient's ability to do sustained work-related physical activity throughout an eight-hour workday…Does the patient's leg(s) need to be elevated to reduce swelling during the daytime? Yes…45˚…once or twice."); (R. 676-77) ("Please answer the following questions concerning your patient's impairments…With prolonged sitting, should your patient's leg(s) be elevated? Yes…over his head…70% [of an 8-hour working day]."). These opinions generated in connection with a patient's application for social

security benefits are a far cry from a doctor-patient recommendation as part of a regular course of treatment or diagnosis, and the ALJ considered them appropriately.

The ALJ also noted that Claimant's assertion of swelling in his lower extremities was not substantiated by any independent observations of edema, or swelling, in Claimant's legs during his medical visits. In fact, after he presented with some "[t]race edema" during a hospital visit in 2013, (R. 30, 393-94), and described "increasing lower extremity edema" to his doctor in 2014 (which the doctor concluded may be a result of his "weight gain and by the fact that he also has some issues with his salt intake"), Claimant was prescribed a diuretic medication, (R. 394, 419), that largely resolved his edema, at least according to the medical record after that point. And although Claimant counters with the sweeping generalization that the "record does, in fact, show periodic edema" and that this "support[s] [Claimant's] alleged need to elevate his legs," that is not a fair reading of the medical evidence. [ECF No. 24] at 3. No physical examination after Claimant's initial complaint documented any notable occurrences of edema. (R. 419, 420, 423, 425-26, 429, 432, 681, 683, 685, 687, 706, 708, 713, 715, 717, 721, 725-26). In fact, physician notes from many examinations specifically and affirmatively disclaimed that Claimant had swelling in his extremities. And the single mention of edema in the record upon which Claimant's argument rests is Dr. Jain's February 2, 2017 treatment note, which already stands in stark contrast to the longitudinal medical evidence. Indeed, while that note does reference, without apparent support, that Claimant has a medical history of "periodic edema on exam," it also states that Claimant had no edema on that date, as was the

18

case on every other date Dr. Jain examined Claimant. (R. 686-87) ("EXT: no clubbing or cyanosis…EXT: no edema.").

Although the argument that a lack of edema is not necessarily inconsistent with Claimant's need to elevate his legs has some merit, *Anders*, 2021 WL 2396236, at *4, the Court is unwilling to say that the ALJ was patently wrong in deciding not to fully credit Claimant's testimony about his leg elevation limitation. *See also, McKinzey v. Astrue,* 641 F.3d 884, 890–91 (7th Cir. 2011) (concluding "that the ALJ's credibility determination was adequately supported by evidence in the record" even though the "credibility determination was not without fault"). Dispositively, no medical provider ever recommended as part of Claimant's treatment that he needed to do so. On balance, the ALJ considered the appropriate factors, of which objective medical evidence was one, and concluded that Claimant's testimony could not be reconciled with the record as presented. This Court will not substitute its judgment for that of the ALJ by reweighing the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) ("[E]ven if reasonable minds could differ on the ALJ's rejection of [the claimant's] testimony, we will not reweigh evidence or substitute our judgment for the ALJ's.").

### c. Respiratory Symptoms

Finally, the ALJ touched on Claimant's subjective reports that he was experiencing work-preclusive shortness of breath during the day and had difficulty breathing in cold or hot temperatures. (R. 29-30). Claimant does not directly challenge the ALJ's assessment of his subjective respiratory complaints, and so this

19

Court is reluctant to wade into an undeveloped argument. Suffice it to say that the ALJ supported her conclusion that Claimant's respiratory issues appeared to be well-controlled by Claimant using his inhalers as needed, an Advair disc as a rescue inhaler, and his being compliant with his BiPap machine with substantial evidence. (R. 30-31). She reviewed the objective medical evidence and noted that Claimant's mostly normal examination findings were consistent with well-controlled respiratory symptoms. (R. 30-31); (R. 680-81) (3/24/15) ("RESP: dyspnea and occasional uses inhaler…RESP: clear to auscultation and percussion"); (R. 682-83) (9/29/15) (same); (R. 684-85) (7/22/16) (same); (R. 686-87) (2/2/17) (same). So too did she consider Claimant's infrequent need to see a pulmonologist to address his shortness of breath and sleep-related breathing issues, as discussed further below.

### d. Other Issues

In evaluating Claimant's subjective symptom reports, the ALJ also vaguely mentioned that Claimant's "conservative course of treatment" was not consistent with the degree of limitation alleged. Claimant argues that the ALJ committed reversible error with this line of reasoning, as the regulations state that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96–7p, 1996 WL 374186, at *7 (Jul. 2, 1996); *see also, Moss v. Astrue,* 555 F.3d 556, 562 (7th Cir. 2009). "[T]he agency has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *Roddy v. Astrue,* 705 F.3d 631, 638 (7th Cir.

2013). And other than a few references to Claimant being specifically referred to physicians that were "in network," the ALJ did little in her written opinion to discuss the references in the record to Claimant's insurance concerns and how that may have affected his chosen course of treatment or failure to seek more aggressive interventions for his conditions.

Although the ALJ did not explicitly discuss, in her written opinion, the impact of Claimant's shifting insurance coverage on her characterization of Claimant's care as relatively "conservative," it clearly was on her mind at Claimant's hearing. The ALJ and Claimant engaged in a lengthy back and forth about Claimant's insurance coverage and possible financial hardships that would have precluded Claimant from pursuing more aggressive treatment, had it been recommended or required. (R. 51-54). During that exchange, Claimant provided some context for the notes in Dr. Jain's records that suggested he was having insurance struggles, (R. 682), and explained that at a singular point in time, he experienced some insurance issues because he moved "from his union insurance to [his] buy-off-the-exchange insurance." (R. 52). It was not, as Claimant now suggests the Court should infer from Dr. Jain's medical records, as if Claimant did not have insurance to help defray his medical costs. Rather, Claimant needed a new primary care doctor who, in turn, needed to make new referrals for his new insurance to cover his treatment. (R. 52-53). And although Claimant expressed some frustration that his new insurance, Blue Cross Blue Shield, could not preauthorize certain tests and confirm to Claimant that those tests would be covered, that is a far cry from cases in which courts in this district have chastised

an ALJ for failing to consider a claimant's financial difficulties and how that may affect a course of treatment. *See, e.g., Sabo D. v. Saul,* 2021 WL 1315630, at *6 (N.D. Ill. 2021) (where the record showed that the claimant had significant financial difficulties, i.e. he lost his job, went bankrupt, and had no insurance whatsoever, the ALJ erred in not discussing these barriers to treatment during his assessment of the claimant's subjective symptom testimony).

Certainly, it would have been better for the ALJ to specifically mention whether Claimant's change in insurance from a union-based plan to an open marketplace plan affected the type of treatment he sought and/or received during the relevant time period. But, on balance and taking into account the extensive colloquy between Claimant and the ALJ at the hearing on that subject, it is clear to the Court that the ALJ was aware of Claimant's shifting insurance coverage and that she considered its impact on Claimant's care when she commented on the relatively conservative nature of that care in her written opinion. The Court sees no reversible error based on the facts of this case, especially where the Seventh Circuit recently described that where an ALJ's "analysis surely could have been better, but [it] is not a circumstance where an ALJ altogether missed a medical opinion, ignored important testimony, or reasoned in terms lacking coherence," affirmance is warranted. *Anders,* 2021 WL 2396236, at *2-3.

In sum, the ALJ and the Appeals Council considered Claimant's subjective complaints and evaluated the relevant evidence of record, including the objective medical evidence and Claimant's activities of daily living. But after considering this

evidence, the ALJ simply did not believe Claimant's pain was as debilitating as he claimed. Nor was she required to do so. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) (The "administrative law judge did not have to believe [Claimant's testimony].")). Instead, her obligation was "to rationally articulate the grounds for…decision," *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir. 2002), which she did here. Particularly given that credibility determinations are due special deference as factual findings, *Matthews v. Saul,* 833 F. App'x 432, 438 (7th Cir. 2020), Claimant offers no meaningful reason the ALJ's subjective symptom assessment should not be upheld, nor does this Court believe the ALJ was patently wrong in this case.

## II.     The Medical Opinions of Record

### a.  The State Agency Physicians

Claimant's first claim of error regarding the medical opinion evidence is that the ALJ relied on outdated opinions from the state agency physicians when she formulating the RFC and discounted Dr. Jain's opinion. The Court is unpersuaded.

Claimant filed his Title II application for DIB on August 28, 2014. The state agency physicians rendered their opinions on December 10, 2014, (R. 85-94), and June 11, 2015, (R. 96-105), after which Claimant appeared at his first hearing with the ALJ on November 2, 2016. That hearing was continued so that Claimant could obtain representation and a second hearing was held on March 7, 2017. The ALJ ultimately rendered her opinion on May 18, 2017. According to Claimant, in the gap between the state agency physician's June 2015 opinion and the ALJ's May 18, 2017 opinion, new and significant medical evidence arose that should have been evaluated

by an independent medical expert. Specifically, Claimant points to Dr. Jain's note in September of 2015 that Claimant had elevated blood pressure (R. 682), Dr. Jain's note in July of 2016 that he was classifying Claimant as NYHA Class III, and Dr. Jain's February 2017 note that a heart transplant might be considered for Claimant. [ECF No. 13] at 13-14. Because of these new medical findings, it was incumbent on the ALJ, in Claimant's view, to order an independent medical evaluation to fill in the gap in time between the state agency opinions and the ALJ's opinion.

The Court measures the sufficiency of the record differently. "It is common for there to be a lag between the state agency physicians' reviews and the ALJ's decision, so the fact that new medical records came in after the state agency physicians conducted their reviews, is not, by itself, problematic." *Shelia M. v. Saul*, 2021 WL 1784775, at *6 (N.D. Ill. 2021) (citing *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end.")). Instead, the dispositive question is whether there is "evidence containing new, significant medical diagnoses" postdating the state agency physician's opinion that could reasonably have changed the outcome of that opinion. *Stage v. Colvin,* 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where state agency physician did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion"). Here, there were no significant medical findings that the ALJ failed to the consider, nor was it incumbent on the ALJ to seek an updated medical

24

review based on isolated notes from a treating physician to whom the ALJ ultimately afforded little weight, as described in Section II of this opinion.

Moreover, Claimant failed to articulate *how* the records he references would have changed the state agency physicians' opinion and offered only conclusory statements that because those opinions were "old opinions from doctors who had an incomplete view of the record," it was improper for the ALJ to rely on them. [ECF No. 13] at 14. Not only is this undeveloped argument problematic, but it also ignores the fact that the ALJ clearly reviewed, considered, and then discussed at length the records Claimant now emphasizes would have changed the outcome of the case, or at least the opinions of the state agency physicians. The ALJ took care to evaluate and distinguish, where necessary, Dr. Jain's records and other post-2015 treatment records when she concluded that Claimant could perform light work with some additional restrictions. *See, e.g., Keys*, 679 F. App'x at 480-81. This reviewing Court will not overstep its limited role and, as Claimant requests, "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul,* 994 F.3d 893, 900 (7th Cir. 2021) (citing *Burmester*, 920 F.3d at 510; *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

### b. Claimant's Treating Physician Dr. Jain

Claimant's second concern with the medical opinion evidence is that the ALJ misjudged Claimant's treating physician's opinion. In fact, although Claimant dedicates a comparatively small section of his brief to the argument that the ALJ

erred when she afforded Dr. Jain's opinion little weight, the accusation that the ALJ did not correctly evaluate Dr. Jain's opinion pervades Claimant's entire memorandum, as Claimant relies on Dr. Jain's notes and opinions in support of almost every other claim of error. Claimant would have this Court weigh Dr. Jain's opinion differently and reach a different conclusion that the ALJ on the evidence before her, but that is not this Court's role. Rather, the inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an "accurate and logical bridge" between the evidence and her conclusion. *See Elder,* 529 F.3d at 415-16 (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527). The ALJ did what she was supposed to do under that deferential standard, and the Court has no grounds to disturb her conclusion as to the weight to be given Dr. Jain's opinion on the facts of this case.

An ALJ must "minimally articulate" her reasons for crediting or rejecting evidence of disability. *Clifford,* 227 F.3d at 870 (quoting *Scivally v. Sullivan,* 966 F.2d 1070, 1076 (7th Cir. 1992)). Claimant filed his disability claims before March 27, 2017, meaning the ALJ was required to evaluate the treating physician opinion in two steps. At the first step, the ALJ must give a treating source's opinion controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2); *see Bates v. Colvin,* 736 F.3d 1093, 1099 (7th Cir. 2013); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011); *Schmidt v. Astrue,* 496

26

F.3d 833, 842 (7th Cir. 2007). Then, at the second step, if the ALJ decides a treating physician's opinion should not be given controlling weight, she must determine what weight to afford the opinion in light of the factors in 20 C.F.R. § 404.1527(c)(2). *Scrogham v. Colvin,* 765 F.3d 685, 697 (7th Cir. 2014). These factors include the nature of the examining relationship, the length of the treating relationship, whether the medical evidence supports the opinion, whether the opinion is consistent with the record, the physician's specialization, and any other factors that relate to the opinion. *Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see also, Latkowski v. Barnhart,* 93 F. App'x 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 F. App'x 939, 942 (7th Cir. 2004). Once contrary evidence is introduced, a treating physician's opinion becomes just one piece of evidence for the ALJ to evaluate. *Ray v. Saul,* 2021 WL 2710377, at *2 (7th Cir. 2021).

Although an ALJ must consider all the factors set forth in 20 C.F.R. § 404.1527(c), she need not expressly discuss each factor in her written opinion. *Schreiber v. Colvin,* 519 F. App'x 951, 959 (7th Cir. 2013) (rejecting claimant's argument that the ALJ erred by not specifically addressing each factor). As long as she otherwise explains why the treating physician's opinion is not supported by the medical record and is inconsistent with the rest of the record, that usually will suffice. *Henke v. Astrue,* 498 F. App'x 636, 640 n. 3 (7th Cir. 2012) ("The ALJ did not explicitly

weigh every factor [in 20 C.F.R. § 404.1527] while discussing her decision to reject [the treating physician's] reports, but she did note the lack of medical evidence supporting [the treating physician's] opinion...and its inconsistency with the rest of the record...This is enough"); *see also, Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) ("treating physician's opinion is entitled to controlling weight unless it is 'inconsistent with the other substantial evidence.' "). Ultimately, the weight accorded to a treating physician's opinion must balance all the circumstances and recognize that while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted).

Here, the ALJ followed the two-step process prescribed by the regulations and explained that, although Dr. Jain did have a treating relationship with Claimant, she could not afford controlling weight to his opinion because it was overwhelmingly based on Claimant's subjective reports and was inconsistent with Dr. Jain's own records of Claimant's treatment, other medical evidence in the record, Claimant's activities of daily living, and Claimant's longitudinal course of treatment. (R. 29-31).

Specifically, the ALJ was aware of the nature and extent of Claimant's relationship with Dr. Jain, *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010), and substantively discussed many of Claimant's visits with Dr. Jain throughout the relevant period. But, she explained Dr. Jain's opinion was entitled to only "little

28

weight" because it was contradicted by other evidence and unsupported by objective tests. (R. 30-31). Dr. Jain's opinion also was, in the ALJ's view, internally inconsistent with Dr. Jain's own notes of his visits with Claimant. *Knight*, 55 F.3d at 314 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record). Almost every time he examined Claimant, Dr. Jain noted normal examination findings; or at least, examination findings that were significantly less limiting than those Dr. Jain ultimately provided in his opinion. (R. 418-474, 678-89). And as described in detail in Section I of this opinion, the ALJ also clearly considered Claimant's activities of daily living in the context of Dr. Jain's opinion, (R. 29-31), and ultimately concluded that they did not align with the comparatively severe limitations Dr. Jain propounded. Finally, the ALJ considered that Dr. Jain's increased 2017 NYHA classification and single reference to "possibility" of a heart transplant were not consistent with the nature of Dr. Jain's treatment during at that time, which largely consisted of medication management and periodic testing. The record evidence, as the ALJ noted, did not document any recent emergency care visits or anything else to support Dr. Jain's isolated notes that Claimant's condition had rapidly deteriorated in February of 2017. (R. 30). Because the record supports these conclusions, the ALJ provided "'an accurate and logical bridge' between the evidence and her decision" to discount Dr. Jain's opinion. *See Jeske v. Saul,* 955 F.3d 583, 593 (7th Cir. 2020) (quoting *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013)).

As the Seventh Circuit has cautioned, Claimant bears the burden to prove he is disabled by producing medical evidence. *Ray,* 2021 WL 2710377, at *3; *see also, Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). Claimant did not do so here, where his disability claim rises and falls almost entirely on Dr. Jain's opinion. That opinion is, in turn, based largely on Claimant's subjective reports and is inconsistent with Dr. Jain's own medical notes. Claimant did little to support that opinion with other evidence, and so the ALJ's decision on this issue stands. *Id.*

### III. The ALJ's Assessment of Claimant's Residual Functional Capacity and Claimant's Obesity

Finally, Claimant next challenges the ALJ's RFC assessment and postulates that the ALJ overlooked the impact of his obesity on the severity of his other impairments. As discussed below, the Court is unconvinced by Claimant's rote legal citations and undeveloped factual argument on this point and finds that the ALJ did adequately consider Claimant's obesity in combination with his other impairments when she formulated the RFC.

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545(a). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *Id*., and must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, it is also true that "an ALJ need not mention every

piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id.* (citing *Getch*, 539 F.3d at 480). An ALJ's analysis of a claimant's RFC "must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

In formulating the RFC here, the ALJ determined that Claimant was capable of performing light work, as defined in 20 CFR 404.1567(b), with some additional restrictions. (R. 28). Specifically, Claimant can "lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for about six hours total in an 8-hour workday, and sit for about six hours total. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but cannot climb ladders, ropes, and scaffolds. He should avoid concentrated exposure to temperature extremes, pulmonary irritants, and hazards, such as unprotected heights." (R. 28).

As this Court discussed in Sections I and II of opinion, the ALJ conducted a thorough review of all the objective medical evidence, Claimant's subjective testimony, and his activities of daily living. After considering this evidence, together with other non-medical evidence in the record, the ALJ concluded that Claimant's severe impairments – cardiomyopathy, atrial fibrillation; hypertension, sleep apnea, COPD, and obesity – did limit Claimant's ability to work, but not to the extreme degree propounded by Claimant and his treating physician, Dr. Jain. The ALJ also paid particular attention to Claimant's obesity in this case and noted that Claimant's weight and BMI have fluctuated during the relevant period, with Claimant weighing, at various times, between 230 and 282 pounds and his BMI similarly fluctuating

31

between 32.1 and 39.3. (R. 31). And although Claimant accuses the ALJ of "fail[ing] to mention" this significant increase in his BMI and apply it to his combination of impairments, the ALJ in fact did so at length. She explained that she found "substantial medical support that the claimant's medically diagnosed obesity significantly limits his ability to engage in work activity," and that the "combined effects of the claimant's heart disease, chronic obstructive pulmonary disease, hypertension, and obstructive sleep apnea results in greater physical and mental limitations than might be expected without the obesity." (R. 31). The ALJ accommodated Claimant's obesity by limiting him to work "at light exertion level with additional restrictions." (R.31). The ALJ's analysis and reasoning throughout her opinion supports her determination concerning the limiting effects of Claimant's obesity. Claimant certainly would have preferred the ALJ conclude that his obesity functionally limited him in more significant ways, but the ALJ's decision not to do so is not reversible error on this record. *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004). The ALJ adequately considered the totality of the medical evidence in formulating the RFC, including Claimant's obesity, and supported her decision with substantial evidence.

At the end of the day, even if the ALJ could have reached a decision in Claimant's favor on the record before her, which is what Claimant contends she could and should have done, the ALJ's failure to do so is not reversible error as long as the decision the ALJ actually made is supported by substantial evidence in the record and the Court can follow the ALJ's rationale in concluding that Claimant is not

disabled. *Brenda L.,* 392 F. Supp. 3d at 862 ("If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance.") (citing 42 U.S.C. § 405(g)); *see also, Zoch,* 981 F.3d at 601 ("we ask whether the ALJ's decision is supported by substantial evidence – evidence that 'a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Biestek*, 139 S. Ct. at 1154). The Court agrees with the Commissioner that the ALJ's decision in this case passes muster under the applicable legal standards.

## CONCLUSION

Claimant's Motion to Reverse the Decision of the Commissioner of Social Security [ECF No. 13] is denied and the Commissioner's Motion for Summary Judgement [ECF No. 19] is granted.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:    September 9, 2021

33